**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **SYDNEY BRENNAN,**<br>**Plaintiff,**<br><br>**v.**<br><br>**PENNSYLVANIA DEPARTMENT OF CORRECTIONS; CENTURION HEALTH; ERICA BENNING-SMITH; INGRID RENBERG; REBECCA REIFER; KIMBERLY SMITH; DENNA MILLIN; THOMAS MONTAG; NICHOLAS MOHNEY; RICHARD CAMACHO.**<br><br>**Defendants.** | : | **Civil Action No. 26-00119**<br><br>**Jury Trial Demanded** |

# <u>COMPLAINT</u>

1. For almost five years, Plaintiff Sydney Brennan has been denied a simple accommodation for her disabilities by the Pennsylvania Department of Corrections.

2. Ms. Brennan is a transgender woman whose medical and psychiatric conditions are significantly worsened by her facial hair growth.

3. Ms. Brennan has attempted numerous forms of hair removal, including shaving and using hair-removal creams, and none have been successful.

4. Consequently, for the last four years, Ms. Brennan has requested permanent hair removal.

5. Because she is incarcerated, Ms. Brennan is entirely at the mercy of prison staff to provide her with adequate medical care and reasonable accommodations for her disabilities.

6. Permanent hair removal is medically necessary to treat Ms. Brennan's anxiety, depression, and gender dysphoria.

7. Although the procedure she seeks is low-cost, minimally invasive, and poses no discernable risk to institutional security, Defendants have repeatedly denied her this necessary accommodation and treatment.

8. Ms. Brennan has been denied access to programs and services including dental care, visitation, and attending regular programming throughout the facility due to the Defendants' refusal to provide permanent hair removal.

9. For example, Ms. Brennan has suffered from worsening dental disease requiring multiple extractions that remain untreated and cause her pain to this day.

10. In addition, Ms. Brennan's mental health symptoms have been exacerbated by the denial of her accommodation requests and this necessary medical care, further limiting her ability to participate in programs and services at SCI Forest.

11. Ms. Brennan therefore brings this action for injunctive relief and damages for violations of her rights under the Eighth and Fourteenth Amendments to the U.S. Constitution, Title II of the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, and Pennsylvania law.

**JURISDICTION AND VENUE**

12. This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343(a)(3)–(4).

13. Venue lies in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because the events giving rise to this action occurred in Forest County, Pennsylvania, which is in the Western District of Pennsylvania.

## PARTIES

14. Plaintiff Sydney Brennan[1] is a 36-year-old transgender woman currently incarcerated at the State Correctional Institution at Forest ("SCI Forest"), a men's prison operated by the Pennsylvania Department of Corrections.

15. Defendant Pennsylvania Department of Corrections ("DOC") is an agency of the Commonwealth of Pennsylvania that is responsible for the operation of Pennsylvania's state prisons. The DOC receives federal funding and is responsible for providing the people in its prisons with adequate medical care and reasonable accommodations for disabilities. The DOC's principal office is in Mechanicsburg, Pennsylvania.

16. Defendant Centurion Health ("Centurion") is a corporation with its principal place of business in Sterling, Virginia. Pursuant to a contract with the Commonwealth of Pennsylvania, Centurion is responsible for providing psychiatric care to individuals incarcerated in the DOC.

17. Defendant Erica Benning-Smith[2] is employed by the DOC as the Director of the DOC's Bureau of Health Care Services ("BHCS"). She is responsible for the administration of all medical services and disability accommodations provided to individuals incarcerated in the DOC. Her responsibilities include reviewing, revising, and drafting policies governing the provision of medical care in the DOC; overseeing medical contracts with the DOC; and reviewing complaints and grievances regarding medical care and disability accommodations. She is not a medical professional. She is sued in her individual and official capacities.

---

[1] In accordance with Ms. Brennan's gender identity, modern judicial practice, and accepted medical protocols, this Complaint uses female pronouns to refer to Ms. Brennan and does not use her deadname under which she is incarcerated.

[2] For much of the relevant time period, Defendant Benning-Smith's name was Erica Benning. She has since married and adopted the name Erica Smith. For clarity, the complaint refers to her as Defendant Benning-Smith.

18. Defendant Rebecca Reifer is employed by the DOC as the statewide Americans with Disabilities Act ("ADA") Coordinator. She is responsible for reviewing, responding to, and coordinating all disability accommodation requests from incarcerated people in the DOC. She is sued in her individual and official capacities.

19. Defendant Denna Millin is employed by the DOC as Correctional Health Care Administrator ("CHCA") at SCI Forest. As CHCA, she is responsible for overseeing all operations of the prison's medical department. Her responsibilities include ensuring that medical procedures comply with DOC policy, supervising the nursing staff, monitoring healthcare contractors and their employees to ensure they provide appropriate care that conforms to policy and contractual requirements, addressing prisoners' and others' concerns regarding medical and mental health care at the prison, and reviewing and investigating prisoners' requests for disability accommodations. Defendant Millin is sued in her individual and official capacities.

20. Defendant Kimberly Smith was employed as the CHCA of SCI Forest in 2022 and 2023. Defendant Smith is now employed as a Registered Nurse Supervisor ("RNS") at SCI Forest, a role she took, upon information and belief, after leaving the position of CHCA. As RNS, Defendant Smith is responsible for supervising and directing the nursing services provided at SCI Forest and responding to concerns raised by incarcerated people. Defendant Smith is sued in her individual and official capacities.

21. Defendant Thomas Montag is employed by the DOC as a Dentist at SCI Forest. Defendant Montag is sued in his individual capacity.

22. Defendant Nicholas Mohney is employed by the DOC as a Dentist at SCI Forest. Defendant Mohney is sued in his individual capacity.

23. Defendant Ingrid Renberg is employed by Centurian as Statewide Psychiatric Medical Director. She is licensed by the Board of Medicine of the Commonwealth of Pennsylvania as a Psychiatrist. Her responsibilities include evaluating incarcerated people who request gender affirming care and approving off-site specialists and other off-site care for individuals incarcerated in the DOC. Defendant Dr. Renberg is sued in her individual and official capacities.

24. Defendant Richard Camacho, MD is employed by Centurion as a psychiatrist at SCI Forest. He is licensed by the Board of Medicine of the Commonwealth of Pennsylvania as a Psychiatrist. Defendant Dr. Camacho is sued in his individual capacity.

**FACTUAL BACKGROUND**

25. Plaintiff Sydney Brennan first experienced symptoms of gender dysphoria when she was four years old.

26. As a child, Ms. Brennan would tell her mom that she was scared of changes happening to her body that would make her look “like a boy,” since she knew she was a girl.

27. When she was fifteen, Ms. Brennan began considering hormone therapy but did not have access to medical care to begin treatment.

28. Ms. Brennan began taking hormone treatment that she accessed from a friend when she was twenty-two years old.

29. Though her access was not always consistent, Ms. Brennan took hormone treatment medication until she was incarcerated.

30. After her arrival at SCI Forest, it was several years before Ms. Brennan was provided with an evaluation for gender dysphoria or the treatment she had access to in the community.

31. During the four years when Ms. Brennan had no access to hormone treatment, she began growing facial hair that she had not developed before her incarceration.

32. Ms. Brennan was officially diagnosed with gender dysphoria by Defendant Renberg in the summer of 2019.

33. Defendant Renberg also noted that Ms. Brennan suffered from depression and anxiety during the evaluations conducted for her gender dysphoria diagnosis.

34. Ms. Brennan was finally provided with hormone therapy again on September 5, 2019.

35. When Ms. Brennan first saw Defendant Renberg, she explained how her facial hair had been growing in since she lost access to hormone treatment and how that was increasing her gender dysphoria.

36. Although restarting hormone treatment has provided some relief, Ms. Brennan continues to suffer from gender dysphoria and its associated symptoms.

37. A primary source of Ms. Brennan's gender dysphoria is the facial hair she continues to grow despite being placed back on hormone treatment therapy.

38. Facial hair growth causes Ms. Brennan such extreme distress that she covers her face with a medical face mask on a near-constant basis.

39. She has been wearing a face mask every day since they became permitted in the DOC in 2020.

40. She is constantly afraid that DOC policy will disallow face masks in the future.

41. Before face masks were allowed, Ms. Brennan used a homemade, concealer-like product consisting of deodorant and makeup to hide her facial hair.

42. When Ms. Brennan removes her face mask, she feels like the walls are closing in on her, like she is trapped in her body. She cannot focus on anything but the distress she experiences when her facial hair is visible.

43. Ms. Brennan's anxiety and depression have been exacerbated by the distress she feels about her facial hair.

44. She suffers from panic attacks on a monthly basis along with constant anxiety about the incongruence between her appearance and her gender identity.

45. Ms. Brennan is a qualified individual under the ADA since her conditions substantially limit major life activities including eating, communicating, and thinking.

46. Ms. Brennan is unable to think, communicate, or act as she normally would due to overwhelming anxiety, increased heart rate, and difficulty breathing when she is experiencing anxiety and gender dysphoria distress.

47. The World Professional Association for Transgender Health ("WPATH") promulgates Standards of Care for the treatment of gender dysphoria in transgender people. [3]

48. Permanent removal of facial hair is a common treatment for transgender women that suffer from dysphoria related to facial hair growth, and such gender-affirming treatment is medically necessary according to WPATH Standards of Care.[4]

---

[3] Eli Coleman *et al.*, *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, 23 INTERNATIONAL JOURNAL OF TRANSGENDER HEALTH S1-S259 (2022).

[4] *See id*. at S7 ("While nomenclature is subject to change and new terminology and classifications may be adopted by various health organizations or administrative bodies, the medical necessity of treatment and care is clearly recognized for the many people who experience dissonance between their sex assigned at birth and their gender identity.").

49. WPATH Standards of Care recommend that "health care professionals offer transgender and gender diverse people referrals for hair removal from the face, body, and genital areas for gender-affirmation."[5]

50. Hair removal techniques used in gender-affirming care are electrolysis hair removal (EHR) and laser hair removal (LHR).[6]

51. Access to gender affirming care is supported as medically necessary by the American Medical Association,[7] the American Psychological Association,[8] the American Psychiatric Association,[9] the Endocrine Society,[10] the American Academy of Nursing,[11] and dozens of other professional healthcare associations in addition to WPATH.

52. Nevertheless, Defendant Renberg and other DOC staff have told Ms. Brennan that she would not receive permanent hair removal treatment because it is considered "cosmetic" by the DOC.

53. Ms. Brennan has tried alternative methods of hair removal, but none have been successful.

---

[5] *Id.* at S154.
[6] *Id.*
[7] American Medical Association, *Clarification of Evidence-Based Gender-Affirming Care*, H-185.927 (2024), https://policysearch.ama-assn.org/policyfinder/detail/%22Clarification%20of%20Evidence-Based%20Gender-Affirming%20Care%22?uri=%2FAMADoc%2FHOD-185.927.xml.
[8] American Psychological Association, *APA Policy Statement on Affirming Evidence-Based Inclusive Care* (2024), https://www.apa.org/about/policy/transgender-nonbinary-inclusive-care.
[9] American Psychiatric Association, *Position Statement on Access to Care for Transgender and Gender Diverse Individuals* (2018), https://www.psychiatry.org/getattachment/d3ef4763-8a0e-4da3-ab01-efe932ca9478/Position-2018-Access-to-Care-for-Transgender-and-Gender-Diverse-Individuals.pdf.
[10] Endocrine Society, *Transgender Health, An Endocrine Society Position Statement* (2020), https://www.endocrine.org/advocacy/position-statements/transgender-health.
[11] American Academy of Nursing, *Statement on Protecting and Expanding Access to Health Care for Transgender and Gender-Diverse Populations* (2025), https://aannet.org/page/gender-affirming-care-position-statement-2025.

54. Medical and mental health providers have acknowledged the impact of Ms. Brennan's facial hair on her wellbeing for years.

55. Rather than providing her with the accommodation she requires, Defendant Renberg has repeatedly attempted to push psychiatric medication on Ms. Brennan.

56. Ms. Brennan has tried psychiatric medications in the past and found they worsened her symptoms and caused suicidal ideation.

57. Defendants continue to justify their refusal to accommodate Ms. Brennan's need by insisting that she has been offered psychiatric medication and refuses to accept it.

**A. Defendants' Refusal Has Caused Ms. Brennan Unnecessary Suffering and Denied Her Access to Programming**

58. Ms. Brennan has suffered extreme distress and physical suffering due to the DOC's refusal to accommodate her disability.

59. Her need to cover her face as a means of mitigating her symptoms has resulted in limited access to visitation, recreation, and other programming.

60. When she leaves her cell, Ms. Brennan wears her mask constantly and has only limited interactions with peers.

61. She often feels that wearing her mask singles her out and causes increased visibility and at times harassment from other incarcerated people.

62. Ms. Brennan feels constant anxiety about her facial hair even when she is alone in her cell.

63. Ms. Brennan does not accept visitors in person because she is afraid she will be told to remove her face mask in the visitation room, which would likely lead to a panic attack.

64. Ms. Brennan sometimes avoids going to the yard during the summer because wearing a mask in the heat makes it difficult to breathe.

65. When she does attend yard, she sometimes plays handball while wearing her mask, but on hot and humid days she cannot breathe well enough to do so.

66. If she was able to take off her mask, Ms. Brennan would spend more time outside and even join team-sport programs.

67. Ms. Brennan also would be able to go to the gym, run on the track, and get haircuts if she was accommodated with permanent hair removal.

68. Ms. Brennan eats her meals alone in her cell, where she can remove her mask without being seen.

69. These limitations on Ms. Brennan's ability to live within the DOC have left her isolated and depressed.

70. At times, Ms. Brennan's mental distress and feelings of isolation have heightened to the level of suicidal ideation.

71. She sometimes feels like she will never receive the treatment she needs and wishes to escape the suffering she lives with.

72. Ms. Brennan's mental health treatment records are replete with notes from providers explaining that Ms. Brennan's mental health is severely impacted by her facial hair.

73. For example, on June 17, 2022, psychological support staff ("PSS") Jodi Sheesley noted that Ms. Brennan "[s]truggles with passive [suicidal ideation] almost constantly because of distress related to Gender Dysphoria," and that "Ms. Brennan feels that getting help dealing with her facial hair issue would alleviate some of the struggle."

74. PSS Sheesley further noted that she "encouraged [Ms. Brennan] to talk with the administration" and "if needed, PSS [Sheesley] would provide support."

75. On December 5, 2023, PSS Sheesley saw Ms. Brennan and noted in the medical record: "[gender dysphoria] is getting worse b[ecause] unable to get facial hair treated."

76. On May 22, 2024, Psychiatric Nurse Practitioner Margaret Shaffer noted that the denial of permanent hair removal and ongoing distress was "making [Ms. Brennan] feel bad about herself enough to give her fleeting [suicidal ideation]."

77. On August 20, 2024, Ms. Brennan had an appointment with Defendant Camacho, who noted "Patient continue[s] to cover her face due to intolerance with facial hair. She continue[s] to be pre-occupied and appear distraught talking about h[er] facial hair, however able to laugh discussing other aspects in life."

78. On May 30, 2025, PSS Joseph Ellis again confirmed in Ms. Brennan's records that "Ms. Brennan struggles significantly with symptoms related to Gender Dysphoria."

**B. Defendants Have Repeatedly and Arbitrarily Denied Ms. Brennan's Requests for Permanent Hair Removal**

79. Ms. Brennan has requested permanent hair removal since at least 2022, when she first formally requested electrolysis.

80. Until that time, Ms. Brennan had been trying to manage her facial hair with alternative methods including shaving, plucking, and using hair-removal creams.

81. Ms. Brennan was also managing her distress by covering her face with a facemask, which many incarcerated people were doing to protect from the Covid-19 pandemic.

82. Regular shaving is not a viable option because Ms. Brennan's skin is too sensitive and it causes razor burns and ingrown hairs.

83. These injuries have become infected in the past, and on March 27, 2022, Ms. Brennan was told by medical staff that she should not shave her face.

84. Additionally, the act of shaving her facial hair emphasizes Ms. Brennan's gender dysphoria.

85. Plucking every individual hair using tweezers causes Ms. Brennan significant pain and is time intensive.

86. Hair removal cream has caused chemical burns on Ms. Brennan's face.

87. After alternative methods failed and caused further distress and skin irritation, Ms. Brennan sought permanent hair removal.

88. When she requested permanent hair removal, Ms. Brennan was evaluated by Defendant Renberg, who determined that there were "less invasive alternatives" available and recommended that her request be denied.

89. Ms. Brennan's request was then sent to a committee of people in the DOC's central office, including Defendant Benning-Smith, who denied her request.

90. On June 17, 2022, Ms. Brennan submitted a grievance relating to the denial of her requests for medical treatment including permanent hair removal.

91. While acting as the CHCA, Defendant Smith denied this grievance on December 8, 2022, stating "it is determined that facial hair removal by electrolysis is not a medically approved option" despite acknowledging that "the facial hair has created the most anxiety."

92. On May 24, 2023, Defendant Smith provided another response to Ms. Brennan, claiming that Ms. Brennan was denied permanent hair removal because there were "less invasive treatments for facial hair removal."

93. She also noted that Defendants Renberg and Benning-Smith were aware of Ms. Brennan's requests and had also denied the requests.

94. Ms. Brennan continued to try alternative treatments and reiterated her need for care to medical and mental health staff after the denial.

95. When electrolysis was denied by DOC administrators, Dr. Mary Howick prescribed Ms. Brennan with Vaniqua, noting on July 6, 2023, that "[o]bviously shaving and spirinolactone are not working and electrolysis has been denied."

96. Vaniqua is a prescription topical medication used to slow the growth of unwanted facial hair in women, though it does not permanently remove facial hair.

97. Despite Dr. Howick's prescription, Ms. Brennan was repeatedly told that Vaniqua was on "backorder," and never actually received it.

98. Even if she had access to Vaniqua, Ms. Brennan's distress would not be resolved since she would still grow facial hair and be compelled to hide it.

99. In October 2024, Plaintiff's counsel wrote to the DOC to raise concerns about Ms. Brennan's need for accommodation in the form of permanent hair removal.

100. Despite being informed that Ms. Brennan had a legal right to accommodation that was being denied, the DOC again refused to provide treatment or accommodation.

101. Ms. Brennan submitted an ADA accommodation request for permanent hair removal on January 15, 2025, explaining that she suffers from gender dysphoria and anxiety and needs permanent hair removal to accommodate her disabilities.

102. Defendants Reifer and Millin denied her request.

### C. Ms. Brennan's Unaccommodated Disability Has Prevented Her From Accessing Necessary Dental Care

103. As a result of the DOC's refusal to accommodate her disabilities, Ms. Brennan has also been unable to receive necessary dental treatments.

104. Ms. Brennan suffers from panic attack symptoms that prevent her from removing her face mask in front of dental professionals.

105. Ms. Brennan has had several teeth with severe decay that have required removal for years, and she has not been able to have the procedures she needs.

106. Additionally, Ms. Brennan has not received regular cleanings that would help prevent ongoing decay.

107. Several of Ms. Brennan's teeth currently have large cavities that cause sensitivity and pain when she eats, requiring her to avoid eating certain foods and chew using only certain of her teeth.

108. At times, the pain in Ms. Brennan's teeth and gums prevents her from eating at all.

109. Ms. Brennan treats her pain with over-the-counter pain medications when she can access them.

110. Ms. Brennan has asked dental staff if she can be anesthetized during procedures so that she can receive care without mental distress during the treatment, but she has been told that anesthesia is not available.

111. Dental professionals at SCI Forest are aware of Ms. Brennan's need for dental care and have recommended extraction of several of her teeth.

112. They have also noted that without treatment, several more of Ms. Brennan's teeth will require extraction.

113. On May 18, 2022, Defendant Montag treated Ms. Brennan and wrote in her records "#31 carious pulp as history. Inmate would not pull mask down to get adequate visualization b/c [she] is growing facial hair and can't deal with it psychologically."

114. Defendant Montag did not provide any accommodation options to Ms. Brennan, telling her to return to sick call when she was "ready" for treatment.

115. In 2023, Ms. Brennan experienced severe and constant pain from the diseased tooth that required extraction.

116. On January 21, 2023, Ms. Brennan went to sick call with an infection that developed as a result of the tooth decay.

117. On February 7, 2023, PSS Jodi Sheesley noted that Ms. Brennan was "experiencing a significant amount of tooth pain from an infected tooth that needs extracted. However, Ms. Brennan hasn't been able to go to the dentist to have it addressed because of the discomfort she feels regarding her facial hair."

118. Ms. Brennan tried to manage the pain, but it became overwhelming.

119. PSS Sheesley, who was familiar with Ms. Brennan's disability and medical needs, worked with dental staff to clear the dental treatment area so that Ms. Brennan would have less distress from removing her facemask.

120. On March 13, 2023, Ms. Brennan was able to receive the extraction needed, due in part to the accommodation provided, though she still struggled with the experience of exposing her face.

121. Since that time, Ms. Brennan has not been able to receive the ongoing dental treatment she requires.

122. Dental staff have not offered the same kind of accommodation or other methods of accommodating Ms. Brennan's disability such that she could receive treatment.

123. On September 12, 2025, Defendant Mohney determined that two more of Ms. Brennan's teeth had become "non-restorable" and required extraction.

124. Defendant Mohney noted that Ms. Brennan's lack of dental treatment was causing "risk of extensive infections, further destruction of supporting tissues, and risk of sepsis."

125. Defendant Mohney also documented Ms. Brennan's distress about her facial hair, which was preventing her from removing her mask for treatment.

126. Defendant Montag again failed to provide any accommodation that would allow Ms. Brennan to access a preventative cleaning on September 23, 2025.

127. Despite knowing that Ms. Brennan needed care and was not receiving it because of her disability, Defendants Mohney and Montag made no effort to provide Ms. Brennan with any accommodation or refer her to a provider that could do so.

128. The years-long delay in her care is likely to cause permanent dental damage and result in even more extractions than are already indicated.

**D. Defendants Have Shown Deliberate Indifference to Ms. Brennan's Serious Medical Need for Gender Affirming Care**

129. Ms. Brennan has informed medical and mental health staff repeatedly that she is in need of treatment in the form of permanent hair removal.

130. As health care providers, Defendants Smith, Renberg, and Camacho have utterly failed Ms. Brennan by taking no action to treat Ms. Brennan's obvious need for gender-affirming care or referring her to providers that can do so.

131. Defendant Smith has more than once told Ms. Brennan that her need for permanent hair removal is "out of her hands" when Ms. Brennan has detailed the severe mental anguish she was experiencing.

132. After Vaniqua became unavailable, Nurse Practitioner Natalie Rossman sought approval to treat Ms. Brennan with permanent hair removal.

133. Ms. Rossman was told that permanent hair removal would not be provided in the DOC and noted on March 13, 2025 "[n]o other alternatives available at this time."

134. Defendant Camacho has treated Ms. Brennan since at least July 2022 and has long been aware of the distress she experiences due to her facial hair.

135. Defendant Camacho has made no attempt to provide treatment or a referral to staff at SCI Forest for Ms. Brennan's medical needs despite knowing she is "distraught" because of the denials of facial hair removal treatment.

136. Defendant Camacho has at times offered psychiatric medication to Ms. Brennan, but Ms. Brennan has explained that psychiatric medications worsen her symptoms.

137. Defendant Camacho has noted over time that Ms. Brennan's symptoms remain the "same if not worse."

138. Defendant Renberg has been trained in WPATH standards and thus knows that the standard of care includes considering hair removal through electrolysis to help alleviate gender dysphoria, yet repeatedly denies Ms. Brennan's requests for treatment and minimizes her symptoms.

139. Though "psychiatric symptoms lessen with appropriate gender-affirming medical and surgical care," Defendant Renberg refuses to provide access to that care, either due to DOC policy restrictions or her own misunderstanding of Ms. Brennan's needs.

140. Defendant Benning-Smith is not a medical professional, but Ms. Brennan has been denied permanent hair removal because of decisions made by BHCS, which is led by Defendant Benning-Smith.

141. When Ms. Brennan formally requested permanent hair removal again on July 15, 2025, she was again told that BHCS had reviewed her records and refused to intervene to provide the treatment she requires.

**E. Defendants Have Failed to Provide Legally Required Accommodations**

142. Defendants Smith, Benning-Smith, Renberg, Millin, Reifer, and Camacho have been aware of Ms. Brennan's inability to access DOC programs and services and made no attempt to provide an accommodation.

143. On January 8, 2024, after Ms. Brennan explained that she was suffering from dental pain that she could not have treated, Defendant Smith responded by writing that "refusing dental care because of facial hair is a choice," and made no effort to facilitate treatment.

144. When Ms. Brennan followed the DOC's procedure for formally requesting an accommodation, Defendants Reifer, Millin, and Benning-Smith each denied her and claimed no responsibility for providing the accommodation Ms. Brennan sought.

145. Ms. Brennan explained in her accommodation request that she was not able to access dental treatment, visitation, communal dining, and shower facilities due to her disability.

146. Nevertheless, each Defendant denied her the accommodation she needed to access these services.

**CAUSES OF ACTION**

**Count I: Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132**
(against Defendant Pennsylvania Department of Corrections and Defendants Smith, Benning-Smith, and Reifer in their official capacities)

147. The allegations set forth in each of the preceding paragraphs are incorporated herein by reference.

148. Ms. Brennan is a qualified individual with a disability that substantially limits her major life activities under Title II of the Americans with Disabilities Act.

149. Defendant Pennsylvania Department of Corrections ("DOC") is a public entity under Title II.

150. Defendants discriminate against Ms. Brennan due to her disability and cause her to be excluded from programs, services, and activities due to her disability in violation of Title II.

151. Defendants refuse to make a reasonable accommodation for Ms. Brennan that would enable her to equally access and benefit from the programs, services and activities provided by the DOC.

152. The DOC has exhibited deliberate indifference in that it was and is aware that Ms. Brennan's federally protected rights were and are likely to be violated.

153. The DOC is vicariously liable for the deliberate indifference of its employees who have discriminated against Ms. Brennan on the basis of her disability.

**Count II: Section 504 of the Rehabilitation Act, 29 U.S.C. § 794**
(against Defendant Pennsylvania Department of Corrections)

154. The allegations set forth in each of the preceding paragraphs are incorporated herein by reference.

155. Ms. Brennan is a qualified individual with a disability under Section 504 of the Rehabilitation Act.

156. At all times relevant to this complaint, Defendant received federal funding.

157. Defendant discriminated against Ms. Brennan by reason of her disability by failing to provide her with reasonable accommodations for her disability and excluding her from and denying her the benefits of the DOC's programs, services, and activities.

158. The DOC has exhibited deliberate indifference in that it was and is aware that Ms. Brennan's federally protected rights were and are likely to be violated.

159. The DOC is vicariously liable for the deliberate indifference of its employees who have discriminated against Ms. Brennan on the basis of her disability.

**Count III: 42 U.S.C. § 1983 – Eighth Amendment**
(against Defendants Smith, Benning-Smith, Renberg, Reifer, Millin, Camacho, Montag, and Mohney)

160. The allegations set forth in each of the preceding paragraphs are incorporated herein by reference.

161. Defendants have violated and continue to violate Ms. Brennan's right to be free from cruel and unusual punishment under the Eighth Amendment to the United States Constitution through their deliberate indifference to her serious medical needs.

**Count IV: Professional Negligence and Vicarious Liability under Pennsylvania Law**
(against Defendants Centurion Health, Smith, Renberg, Camacho, Montag, and Mohney)

162. The allegations set forth in each of the preceding paragraphs are incorporated herein by reference.

163. At all relevant times, the individual Defendants have had a duty to Ms. Brennan to act in accordance with the standard of care required of physicians and to act as a reasonable person would under the same or similar circumstances.

164. Defendants breached their duties as physicians by deviating from the standard of care in their treatment of Ms. Brennan.

165. As a result of Defendants' acts and omissions, Ms. Brennan experienced physical harm, unnecessary pain and suffering, and emotional distress.

166. Defendant Centurion Health is vicariously liable for the negligence of its employees, Defendants Renberg and Camacho.

## REQUESTED RELIEF

WHEREFORE, Plaintiff Sydney Brennan respectfully requests that the Court grant the following relief:

A. A permanent injunction requiring Defendants to provide Ms. Brennan with permanent facial hair removal and all other accommodations necessary for her disability;
B. An award of compensatory damages against the DOC, Centurion, and all other Defendants in their individual capacities;
C. An award of nominal damages on all claims for which compensatory damages are not awarded;
D. An award of punitive damages against Centurion and all Defendants in their individual capacity;
E. Reasonable attorney's fees and costs; and
F. Such other relief the Court deems just and proper.

Respectfully submitted,

*/s/ Lisa Fanning*
Lisa Fanning (PA 336196)
PA INSTITUTIONAL LAW PROJECT
718 Arch Street, Suite 304 South
Philadelphia, PA 19106
lfanning@pilp.org

*/s/ Alexandra Morgan-Kurtz*
Alexandra Morgan-Kurtz (PA 312631)
PA INSTITUTIONAL LAW PROJECT
247 Fort Pitt Blvd, 4th Floor
Pittsburgh, PA 15222
amorgan-kurtz@pilp.org

*Counsel for Plaintiff*

**VERIFICATION**

Pursuant to 28 U.S.C. § 1746, I, Sydney Brennan, hereby verify under penalty of perjury that the allegations contained in the foregoing Complaint are true and accurate to the best of my knowledge. Executed on 04/12, 2026.

Sydney Brennan